## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

YIT CHEE WAH, a/k/a/ Steven Yit, on Behalf of and Solely in His Capacity as the Liquidator of RHODIUM INTERNATIONAL TRADING USA, INC.,

       Plaintiff,

          v.

GREAT AMERICAN INSURANCE COMPANY (f/k/a FCIA MANAGEMENT COMPANY, INC.),

       Defendant.

Civil Action No.
1:23-cv-00918-SDG

### OPINION AND ORDER

This matter is before the Court on Defendant Great American Insurance Company's motion to dismiss [ECF 14]. For the following reasons, Great American's motion is **DENIED**.

## I.   BACKGROUND

This is a dispute over insurance coverage. Rhodium International Trading USA, Inc. (represented in this litigation by its liquidator, Yit Chee Wah[1]) is an

---

[1]   Pursuant to Yit's jurisdictional notice, ECF 20, the Court is satisfied that Yit, a citizen of Singapore, is a real party in interest in this suit. *See* ECF 20, at 2–3. This suit is thus a civil action between citizens of different states—Rhodium, a citizen of Delaware and Georgia, and Great American, a citizen of Ohio—in which a citizen of a foreign state is an additional party. The Court may thus exercise diversity jurisdiction under 28 U.S.C. § 1332(a)(3).

international trader of commodities like sugar, copper, and coal.[2] Rhodium buys these commodities and resells them for profit,[3] sometimes on credit with payment scheduled for weeks or even months after delivery.[4] Because Rhodium stands to lose millions if a credit buyer becomes insolvent before payment,[5] it protects itself through trade credit risk insurance.[6]

At issue in this case is a trade credit risk insurance policy (the Policy) that Rhodium bought from Great American.[7] The Policy was in effect for one year, from August 1, 2019, to August 1, 2020; it provided "comprehensive" trade credit risk insurance for "[a]gricultural commodities, ferrous and non-ferrous metals, and coal;" and it had a credit limit of $27.9 million (plus interest).[8] Rhodium submitted eight claims[9] under the Policy for losses totaling over $20 million.[10] Great

---

[2]   ECF 13, ¶ 1.

[3]   *Id.* ¶ 2.

[4]   *Id.* ¶ 3.

[5]   *Id.* ¶ 4; *see, e.g.*, ECF 13-7, at 4 (invoicing non-payment of $4,523,400 contract).

[6]   ECF 13, ¶ 5.

[7]   *Id.* ¶ 6.

[8]   *Id.*

[9]   For clarity, "claim" in this Order refers only to insurance claims, and not to legal contentions or to causes of action.

[10]   *Id.* ¶ 7.

American denied the claims,[11] and this suit followed. Great American now moves to dismiss under Fed. R. Civ. P. 12(b)(6).[12]

## II.   LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that, when taken to be true, plausibly entitle the plaintiff to relief. *Ingram v. Kubik*, 30 F.4th 1241, 1255 (11th Cir. 2022). The Eleventh Circuit uses a two-step process to evaluate complaints under Rule 12(b)(6). First, courts must identify purported factual allegations that merely assert legal conclusions, and disregard them. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). Second, courts must assume the truth of all non-conclusory allegations and determine whether they can support a reasonable inference of the defendant's liability. *Id.* at 1335. The plaintiff's non-conclusory allegations must be construed "in the light most favorable to the plaintiff." *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019). Where, as here, the complaint is accompanied by exhibits, the exhibits are considered part of the complaint for purposes of the Rule 12(b)(6) motion. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007) (citing Fed. R. Civ. P. 10(c)).

---

[11]   ECF 13, ¶ 8.

[12]   ECF 14.

### III.   ANALYSIS

Yit's complaint contains two counts under Georgia law.[13] Count One alleges that Great American's denial of Rhodium's claims under the Policy was a breach of contract.[14] Count Two alleges that Great American breached the Policy in bad faith in violation of O.C.G.A. § 33-4-6.[15] The Court concludes that both counts survive Great American's motion to dismiss.

### A.   Count One: Breach of Contract

To prove breach of contract under Georgia law, a plaintiff must establish three elements: 1) the contract was breached; 2) the plaintiff suffered damages from the breach; and 3) the plaintiff has the right to sue for the breach. *CoreVest Am. Fin. Lender LLC v. Stewart Title Guar. Co.*, 358 Ga. App. 596, 599 (2021). Here, the complaint alleges that Great American is liable for breach of contract because 1) it wrongfully denied coverage on eight claims under the Policy;[16] 2) Rhodium suffered over $20 million in damages from Great American's denial;[17] and 3) Rhodium, as the Policy's holder, has the right to sue for the wrongful denial of

---

[13]   The parties agree that Georgia law controls in this case. ECF 13, ¶ 32; ECF 13-1, at 19; ECF 14, at 16.

[14]   ECF 13, at 22.

[15]   *Id.* at 23–24.

[16]   ECF 13, ¶ 60.

[17]   *Id.* ¶ 61.

coverage.[18] In moving to dismiss, Great American asserts two fatal deficiencies in the complaint: first, that none of the eight transactions for which Rhodium submitted claims were covered by the Policy;[19] and second, that Rhodium assigned its benefits under the Policy to non-party White Oak Trade Finance, LLC, meaning Rhodium lacks the right to sue for breach.[20] Great American's assertions are addressed in turn.

### 1.    The Policy's Unambiguous Language Does Not Preclude Great American's Liability for Breach of Contract.

Great American asserts that it is not liable for breach of contract because Rhodium's allegations, even assumed to be true, do not establish that Rhodium submitted claims triggering Policy coverage. To determine whether Rhodium's claims could have triggered coverage, the Court must interpret the Policy's relevant terms in accordance with Georgia contract law. *Ace Am. Ins. Co. v. Wattles*

---

[18]    ECF 16, at 18.

[19]    ECF 14, at 16.

[20]    *Id.* at 24. Great American makes this argument only under Count Two for bad faith. But if Rhodium cannot sue for bad faith because it has given away its "legal right to receive the benefits under the policy," *id.*, then it cannot sue to recover those policy benefits under breach of contract either. *See Blue Cross & Blue Shield of Ga., Inc. v. Bennett*, 223 Ga. App. 291, 291–92 (1996) (holding that an assignment of contractual benefits divested the assignor of both "the cause of the action for the benefits" *and* "all ancillary remedies and rights of action which [the plaintiff] would have had as incidents to the cause of action for the benefits"—the latter including bad faith).

*Co.*, 930 F.3d 1240, 1252 (11th Cir. 2019) ("Under Georgia law, an insurance policy is a contract and subject to the ordinary rules of contract construction.").

The "cardinal rule" of contract interpretation is "to determine and carry out the intent of the parties." *Nat'l Cas. Co. v. Ga. Sch. Bds. Ass'n–Risk Mgmt. Fund*, 304 Ga. 224, 228 (2018). In divining the parties' intent, courts should "consider the insurance policy as a whole" and do their best both to "give effect to each provision" and to "harmonize" all provisions together. *Id.*

Georgia courts interpret contracts in three steps. At the first step, courts determine whether a contract's language, under the "commonly accepted" or dictionary meaning of its words, is "clear and unambiguous." *State Farm Mut. Auto. Ins. Co. v. Staton*, 286 Ga. 23, 25 (2009); *Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 288 Ga. 749, 751 (2011). If the contract is clear and unambiguous, courts fix the contract's meaning using the contract's language alone. *Am. Empire*, 288 Ga. at 750. But, if the contract is ambiguous, courts move to the second step and attempt to resolve the ambiguity by applying Georgia's principles of contract interpretation. *RLI Ins. v. Highlands on Ponce, LLC*, 280 Ga Ap. 798, 800 (2006). Only if ambiguity remains after step two do courts move to step three and submit the issue of the contract's meaning (as a dispute of fact) to a jury for resolution. *Id.* at 800–01.

An insurance policy is ambiguous where "its terms are subject to more than one reasonable interpretation." Whether a policy is ambiguous is an important question because, once a policy is deemed ambiguous, it is subject to the interpretive principle that ambiguities are "construed liberally against the insurer and most favorably for the insured." *Staton*, 286 Ga. at 25; *Hurst v. Grange Mut. Cas. Co.*, 266 Ga. 712, 716 (1996). Thus, while bearing in mind the "low threshold for establishing ambiguity in an insurance policy," *St. Paul Mercury Ins. Co. v. FDIC*, 774 F.3d 702, 709 (11th Cir. 2014), courts must also take care not "to create an ambiguity where none, in fact, exists." *Staton*, 286 Ga. at 25. When a policy can only be reasonably read one way, courts must enforce that reading, regardless of whom it favors. *Id.*

Turning then to the Policy: the parties agree that it provides coverage only for "Insured Transactions,"[21] which by definition must satisfy certain criteria—shipment within a certain time period, for example, or payment in a certain currency.[22] Where the parties disagree is over the interpretations of four criteria, listed below (here, "you" is Rhodium and "the Buyer" is Rhodium's buyer for a given transaction):

---

[21]   ECF 13-1, at 5; ECF 14, at 3–4.

[22]   *Id.*

1. The transaction must involve a "shipment and sale" of products;[23]

2. The transacted-for products must be "placed en route to the Buyer on the order of you" or an agent;[24]

3. The transaction must be "evidenced by" an "agreement … set forth" in either (a) a "negotiable instrument" or (b) "open account documents" that "indicate your name and the name of the Buyer";[25] and

4. "[T]he Buyer must be located" in China, Hong Kong, Malaysia, or Singapore.[26]

Great American's position is that the unambiguous meanings of these four criteria exclude all of Rhodium's claims from coverage as a matter of law.[27]

First, according to Great American, the Policy covers none of Rhodium's eight claimed transactions because no "shipment" of products occurred.[28] To be clear, Great American does not deny that products were, in fact, physically shipped,[29] nor can they: "shipment" is "[t]he transportation of goods by sea, road, or air; esp., the delivery of goods to a carrier and subsequent issuance of a bill of

---

[23]  *Id.*

[24]  *Id.*

[25]  *Id.* at 5, 9.

[26]  *Id.* at 5, 32.

[27]  ECF 14, at 21–22.

[28]  *Id.* at 19.

[29]  *See id.* (referring to products that had "already left the departure port when Rhodium [] purportedly purchased them") (emphasis omitted)).

lading,"[30] and Great American agrees that goods were transported by sea, upon delivery to a carrier and issuance of a bill of lading.[31] Great American nevertheless believes that "shipment" under the Policy requires something more, namely, the shipment of products *that Rhodium owned at the time of departure*.[32] Great American thus reads into "shipment" a requirement that Rhodium have purchased shipped products at a certain time. But "shipment," by itself, does not impose such a requirement, and neither does the Court.

Second, according to Great American, the Policy covers none of Rhodium's eight claimed transactions because products were never "placed en route" to a buyer on Rhodium's order.[33] This argument is much like the first. "En route" means "[o]n the way; in the course of transportation or travel."[34] Rhodium's claim documents establish that, in each claimed transaction, shipped products were placed "on the way" to Rhodium's buyers pursuant to a sales contract executed

---

30  *Shipment*, Black's Law Dictionary (11th ed. 2019).

31  ECF 14, at 9 (relying on Rhodium's allegations that products were "shipped on marine vessels" with "governing bill[s] of lading").

32  *Id.* at 19–20.

33  *Id.* at 19.

34  *En Route*, Black's Law Dictionary (11th ed. 2019).

by Rhodium.[35] Great American nevertheless believes that "placed en route" under the Policy requires something more, namely, that products be placed en route to Rhodium's buyer *directly from the departure port*.[36] Great American thus reads into "placed en route" a requirement that Rhodium sell the products to a final buyer at a certain time. As above, the plain meaning of "placed en route" does not impose such a requirement and, as above, neither does the Court.[37]

Third, according to Great American, the Policy covers none of Rhodium's eight claimed transactions because certain open account documents fail to "indicate" Rhodium's and its buyers' names.[38] The Policy defines "open account documents" as "written purchase order, invoice and shipping documents."[39] As

---

[35] *E.g.*, ECF 13-3, at 33 (requiring, under terms of "SALES CONTRACT," Rhodium to "sell and deliver," and Rhodium's buyer to "buy and take delivery of," shipped products).

[36] ECF 14, at 19–20.

[37] Great American's reading here is strained for another reason. The Policy's "placed en route" language appears in the following context: "Each shipment and sale of products must be shipped to the Buyer during the policy period. Shipment begins when the products are *placed en route* to the Buyer on the order of you or any of your agents." This provision as a whole is best read as governing the timing of transactions with respect to the policy period. Thus, under the provision, whether transactions are deemed to have occurred "during the policy period" depends on when "products are placed en route." There is no textual basis for Great American's position that the three words "placed en route," stripped of context, impose an independent requirement unrelated to the policy period.

[38] *Id.* at 18.

[39] ECF 13-1, at 9.

Great American argues, "shipping documents" in turn include bills of lading. Here, the bills of lading bear the names of neither Rhodium nor its buyers; thus, Rhodium's claims do not trigger coverage.[40] Great American's position is, in effect, that "indicate" should be read to mean "each bear" or "each contain," and that the existence of a single open account document that fails to bear or contain Rhodium's and its buyers' names is grounds to deny coverage.

Great American's reading stretches the meaning of "indicate" too far. To "indicate" means "[t]o point out, point to, make known, show."[41] A requirement that documents "point to" or "make known" certain information is very different from a requirement that each of those documents individually bear or contain it. In everyday use, to say that one thing indicates another is to say that the one implies or signifies the other; indication normally asks for some logical step or some act of deduction. The relevant documents here indicate the names of transacting parties, not by necessarily bearing them on every page, but by together providing a reasonable basis from which to infer them. To satisfy the Policy's requirement that open account documents "indicate" the names of transacting parties, it is enough that the documents here provide the insurer with a reasonable

---

40  ECF 14, at 18–19.

41  *Indicate*, Oxford English Dictionary, https://www.oed.com/dictionary/ indicate_v (last visited Mar. 25, 2024).

basis to conclude that Rhodium and its purported buyer transacted for the claimed amount. [42] Rhodium's open account documents do just that.[43]

Fourth, according to Great American, the Policy does not cover the two (of eight) claimed transactions in which shipments were not sent to a buyer "located in" China, Hong Kong, Malaysia, or Singapore.[44] Instead, the shipments in question were sent to Vietnam[45] and Greece.[46] As Yit points out,[47] however, the *buyers* for those shipments had listed addresses in Hong Kong[48] and Singapore.[49] And the location limitation clearly applies to *buyers*, not product shipments: the Policy "outlines the eligible countries in which *the Buyer* must be located."[50] The difference between Great American and Rhodium's positions is the difference

---

[42]   Because the Court finds that the claimed transactions are evidenced by open account documents, it does not address Rhodium's argument that the bills of lading and sales contracts are negotiable instruments. ECF 14, at 9–14.

[43]   *E.g.*, ECF 13-3, at 39 (indicating, via "COMMERCIAL INVOICE," the sale of "THAILAND CANE RAW SUGAR" by Rhodium to Lemarc Agromond Limited for $768,440 on April 7, 2020).

[44]   ECF 14, at 20.

[45]   ECF 13-3, at 10.

[46]   ECF 13-7, at 10.

[47]   ECF 16, at 16.

[48]   ECF 13-1, at 26.

[49]   *Id.* at 32.

[50]   *Id.*

between "shipments to that country" and "shipments *to Buyers* in that country" —
and the Policy's text is consistent with the latter.[51]

Thus, for each of the four Policy criteria at issue, the Court rejects Great
American's proffered readings as unreasonably narrow. It follows that the Court
rejects Great American's contention that, pursuant to its proffered readings, the
Policy criteria exclude Rhodium's claims from coverage. The Court cannot rule, at
this early stage, that Great American did not breach its contract with Rhodium as
a matter of law.

The Court would reach the same conclusion even if it had determined that
Great American had proffered reasonable alternative readings for the Policy
criteria at issue. The existence of reasonable alternative readings would, under
Georgia's contract interpretation principles, render the Policy ambiguous. And the
applicable principles for interpreting ambiguous contracts strongly favor Yit and
Rhodium, beginning with the bright-line, black-letter rule that ambiguous terms
in an insurance policy are construed strictly against the insurer.

In addition, Yit's allegations include parol evidence that would favor the
resolution of ambiguity in Plaintiff's favor. In Georgia, parol evidence is
inadmissible to contradict or vary a written contract's unambiguous meaning, but

---

51    *Id.*

can be considered "to explain ambiguities and to aid in the construction of contracts."[52] *Kellos v. Parker-Sharpe, Inc.*, 245 Ga. 130, 132 (1980); O.C.G.A. § 13-2-2(1). Here, Yit has alleged that, before the policy was issued, Great American was "specifically" advised of Rhodium's practice of purchasing products mid-shipment, and confirmed to Rhodium that coverage for such mid-shipment transactions would attach "as of the date of the invoice."[53] In other words, Yit has alleged the existence of a parol agreement extending Policy coverage to mid-shipment transactions. Thus, to the extent that the Policy is ambiguous about coverage for mid-shipment transactions, the parol evidence—at least for purposes of Great American's Rule 12(b)(6) motion—resolves that ambiguity in Yit's favor.

Public policy also disfavors a contract interpretation that creates "illusory coverage." *St. Paul*, 774 F.3d at 709. So, where an insurer has accepted payment to mitigate risks "for which the insured reasonably expects it is covered," the policy should be interpreted to cover those risks. *Id.* Here, a significant part of Rhodium's business—at a minimum, $20 million of it—involved buying and selling products mid-shipment. (Great American goes further and characterizes Rhodium's

---

[52]   Often, parol evidence is excluded under a merger or integration clause, but the Policy contains no such provision. *See* ECF 13-1.

[53]   ECF 13, at 5.

business as exclusively "trading paper."[54]) Interpreting the Policy to exclude transactions where products are bought and sold mid-shipment would, in great part or in whole, deny Rhodium the insurance coverage for which it paid hundreds of thousands of dollars.[55] Under Georgia law, where the Court can opt for a reasonable reading that avoids such an interpretation, it should.

Because ambiguity in the Policy would be construed against Great American and in favor of coverage at every turn, the Court can only adopt Great American's reading of the Policy at this stage if no other reasonable reading exists. Here, where the more reasonable reading favors coverage for Rhodium's claims, Great American is bound by that reading.

> ### 2.    The Designation of White Oak as "Loss Payee" Does Not Bar Rhodium from Enforcing the Policy.

To succeed in his action for breach of contract, Yit must establish, not only the existence of a contract breach, but his right (as Rhodium's representative) to sue for that breach. And Great American asserts that Yit cannot sue for any alleged breach of the Policy because Rhodium is not the Policy's "holder."[56] The basis for this assertion is a provision in the Policy titled the "Loss Payee Endorsement," which designates third-party-entity White Oak as the Policy's "Loss Payee," and

---

[54]   ECF 14, at 22.

[55]   ECF 13-1, at 17 (setting "minimum premium due" for Policy at $209,250).

[56]   ECF 14, at 23.

authorizes Great American to "make all claim payments relating to the policy" to White Oak, not Rhodium.[57] Great American's position is that the Loss Payee Endorsement is an assignment of all legal benefit under the Policy to White Oak by Rhodium.[58] And under Georgia law, if an insured has assigned its rights under an insurance policy to a third party, the insured has no right to sue to recover benefits under that policy. *Allianz Life Ins. Co. v. Riedl*, 264 Ga. 395, 396 (1994) (holding that assignor of insurance benefits had lost "all right" to those benefits, including the "right of action necessary to enforce that right"). Thus, if the Loss Payee Endorsement is a valid assignment installing White Oak as the "holder" of the Policy, then Yit has no right to bring this suit.

But Great American glosses over an important nuance: Georgia law distinguishes between two types of arrangements in which a third party is made an insurance policy's beneficiary. In one arrangement—the true assignment—the insured (the assignor) executes an enforceable agreement *with the beneficiary* (the assignee); the agreement transfers all of the insured's rights under the policy to the beneficiary, including the right to sue for breach. *See S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 277 (1992) (holding that insured who assigned claim against insurer to third party had forfeited right to recover damages on that claim). But in the

---

57   ECF 13-1, at 23.

58   ECF 14, at 24.

other arrangement—the mere authorization of payment—the insured executes an agreement *with the insurer*, "direct[ing] or authorize[ing] the insurer to make direct payment" to the third party. *Allianz Life Ins. Co.*, 264 Ga. at 396. And a mere authorization of payment, comparable to a limited "power of attorney," does not divest the insured of its right to sue under the policy. *Id.* at 397.

Here, the Loss Payee Endorsement is clearly a mere authorization of payment. The Loss Payee Endorsement is an agreement, not between Rhodium and White Oak (the would-be assignee), but between Rhodium and Great American (the insurer).[59] Like a limited power of attorney, it authorizes Great American to make direct payments to White Oak, but otherwise makes no changes to the parties' legal relationships.[60] It is not an assignment—and not only under binding legal authority, but on the Policy's own terms:

> The Loss Payee agrees that *this endorsement is not an assignment of the policy* or a separate agreement between the Insurer and the Loss Payee, [and] does not give the Loss Payee any right to file a claim or sue under the policy.[61]

---

[59]   ECF 13-1, at 23. The Loss Payee Endorsement states that it "form[s] a part of" the Policy between Great American and Rhodium; in addition, it is issued to Rhodium, is signed by Great American, and lacks White Oak's signature. *Id.*

[60]   *Id.*

[61]   *Id.* (emphasis added).

Georgia law and the Policy's unambiguous language thus both compel the conclusion that the Loss Payee Endorsement does not divest Rhodium of the right to sue for breach. Because the Court rejects Great American's contentions that Yit's allegations fail to trigger Policy coverage and that Yit has no right to sue on the Policy, it declines to dismiss Yit's first count for breach of contract.

### B. Count Two: Bad Faith

This Order has already rejected the grounds on which Great American challenges the sufficiency of Yit's second count for bad faith.[62] Yit's complaint thus survives Great American's Rule 12(b)(6) motion on both counts.

If Great American's briefs make one thing clear, it is the insurer's great regret at issuing the Policy to Rhodium in the first place. As Great American sees it, Rhodium's business model was a shadier proposition than Great American was first led to believe.[63] Great American misses few chances to cast doubt on the "authenticity"[64] and legitimacy[65] of Rhodium's transactions, repeatedly

---

[62]   ECF 14, at 23 (arguing that the bad faith count should be dismissed because it is "predicated on allegations of coverage" and because Rhodium is not the "holder of the policy").

[63]   *Id.* at 8.

[64]   *Id.*

[65]   *Id.* at 20.

referencing Rhodium's "purported shipment[s],"[66] "purported sale[s],"[67] and "purported buyer[s]."[68] In the same way, Great American hints darkly at Rhodium's potentially "fraudulent" conduct,[69] from "falsely representing" its business during the claims adjustment process[70] to making "misrepresentations" in the context of a separate insurance claim (not at issue in this litigation).[71] But however valid Great American's concerns about the legitimacy of Rhodium's claims may be, they cannot make the Policy mean something it does not say. And under the plain meaning of the Policy's terms, Rhodium's breach of contract and bad faith counts both survive Great American's motion to dismiss.

---

[66]   *Id.* at 10.

[67]   *Id.* at 9.

[68]   *Id.* at 10.

[69]   *Id.* at 8.

[70]   *Id.*

[71]   *Id.* at 7–8.

## IV.    CONCLUSION

Great American's motion to dismiss [ECF 14] is **DENIED**. Great American is **ORDERED** to file its Answer within 14 days of this Order, and the parties are **ORDERED** to file a Joint Preliminary Report and Discovery Plan within 30 days of Great American's Answer.

**SO ORDERED** this 28th day of March, 2024.

Steven D. Grimberg
United States District Court Judge